<hr />

## ESTATE OF JAMES BLACK.

### No. 5889 — April 2, 1874.

WILL.—INOFFICIOUS, AB IRATO. CHARGE TO JURY ON CONTEST OF PROBATE.

FACTS.—B. an old ranch settler in California, who was for many years a heavy drinker, in 1865 gave a ranch, together with stock, etc., to his married daughter, the wife of a dentist. B.'s wife died in 1864 while in the dental chair of her son-in-law. In 1866, B., and Mrs. P., a Spanish-Mexican widow, neighbor of B., intermarried, the bride having a family of six children by a former husband. Two months after the marriage, the will in contest was executed. Black by the will devised his entire estate (except some few friendly legacies), to his Executors in trust for his wife and stepchildren, excluding his own daughter on the ground that she was already provided for. B. died in 1870 aged sixty-six years. The daughter contests. GROUNDS:—RESTRAINT, UNSOUND MIND, ALCOHOLISM, UNDUE INFLUENCE, MISREPRESENTATION, HABITUAL INTEMPERANCE.

Construing sections, C. C., 1272; C. C. P., 1312, 1313, 1317.

*S. V. Smith, S. M. Wilson, A. Campbell, Jr.*, for proponents.

*J. M. Seawell, J. McM. Shafter, J. B. Southard*, for contestants.

GENTLEMEN OF THE JURY:—Referring to a few of the facts developed by the testimony, as to which there is no controversy, we find that about the year 1832 James Black, the decedent, came to California and settled in what is now Marin County. He was of Scotch parentage, and had been a sailor. He was an unlettered man. He soon married, and a daughter was born to him. He obtained large tracts of land and settled thereon, and engaged in the then usual

business of pioneers, stock raising.　He had about him numerous dependents, employees and tenants.　He early became addicted to the use of intoxicating liquors.　To what extent, and with what effect, will be for you to determine.　Thus he and his family continued to live upon a tract of land, called the Nicasio or home ranch.　In October, 1863, his daughter married, and is still a wife.　Years before that, he had purchased a tract of over 6,000 acres, known as the Olompali ranch, and in 1865 deeded it to his daughter, Mrs. Burdell, and gave to her with it a band of cattle.　In February, 1864, his wife died in this city, in the dental chair of her son-in-law, Dr. Burdell.　Mrs. Pacheco, a widow, having six children, lived in the vicinity of Mr. Black, and owned with them a tract of over 6,000 acres. In January, 1866, Mr. Black and Mrs. Pacheco intermarried.　In March, 1866, within about two months after the marriage, the paper here offered as a will was executed by Mr. Black.　By the terms of this will, if it shall stand, all of his large landed estate and his personal property, except some devises and legacies to friends and relatives, go to the executors in trust for Mrs. Black, (formerly Mrs. Pacheco), and to her children by a former marriage, no children having been born of the second marriage.　The paper expressly excludes his daughter, Mrs. Burdell, from having any share in his property, for the reason, as stated in the paper, that he had already given her a just portion of his estate.

Mr. Black died in 1870, aged about 66.　If this will shall not stand, one half of this estate will go to Mrs. Black and the other half to Mrs. Burdell, and Mrs. Black's children and the other legatees and devisees will take nothing.

The proponents, the persons named as executors of the will, offer the paper as the last will and testament of Mr. Black and demand that it be admitted to probate.　The contestant, Mrs. Burdell, resists, and claims that this paper is not the will of her father, for the reason, as alleged by her, that her father, at the time of signing the paper, was not of sound and disposing mind, that he was under restraint, undue influence and fraudulent misrepresentation.　This controversy has been three times submitted to juries in Marin

County, and is now here for trial before you upon issues prepared in that county. Those issues I propose to consider in turn, and to state to you my view of the law bearing upon each.

1. The first issue is:

Is the paper now offered for probate, the last will and testament of James Black, deceased?

This issue is rather comprehensive, and was probably intended to embrace all the statutory provisions regarding the execution of wills, including the question as to whether any subsequent will had been executed. I will here consider generally the requisites of a valid will. As the law stood in 1870, at the death of Mr. Black, which is the law governing this case, the following were requisites to a will: It must be in writing, signed by the testator or by some person in his presence by his express direction, and attested by two or more witnesses subscribing their names to the will in the presence of the testator; and the testator must at the time of the execution of the will be of sound and disposing mind, and not under restraint, undue influence or fraudulent misrepresentation.

In this case, this paper offered as a will is in writing; the signature of the testator thereto is admitted; and the formal execution, so far as its being attested by two witnesses subscribing their names in the presence of the testator, has been duly proved. There is no evidence of the execution of any subsequent will. Therefore, if you shall find that the said James Black was, at the time of executing the alleged will, of sound and disposing mind and not under restraint or undue influence, and that there was no fraudulent misrepresentation, the paper is his will, and your answer to this question will be, Yes. But if you shall find that he was not, at the time of executing the alleged will, of sound or disposing mind, or if you shall find that he was under restraint, or undue influence, or that there was fraudulent misrepresentation, then the paper is not his will, and your answer to this question will be, No. This instruction, gentlemen, confines your investigation to the propositions whether Mr. Black

was of sound and disposing mind, not under restraint or undue influence, or fraudulent misrepresentation. As these propositions are embraced in issues following, I shall, in considering those issues, state to you the law relating thereto.

2.—Second issue:

Was the said James Black, at the time of executing the instrument now offered for probate, of sound and disposing mind, and competent to make a will?

If he was of sound and disposing mind, free from restraint and undue influence, he was competent to make a will. A person is of sound and disposing mind, who is in the possession of the natural mental faculties of man, free from delusion, and capable of rationally thinking, reasoning, acting and determining for himself. Weakness of mind is not the opposite of unsoundness. Weakness of mind is the opposite of strength of mind; and unsoundness is the opposite of soundness. Thus, a weak mind may be a sound mind, and a strong mind may be unsound. It is not impossible to find a strong mind, a man possessed of superior talents or of a determined will, so wrought upon by some delusion, as to be unsound; and a weak mind, a mind of what we call a lower grade of intellect, may be so evenly balanced as to be perfectly sound. It is not the weakness or strength of mind which determines its testamentary capacity; it is its soundness, that is, its healthy condition and healthy action. Lord Coke classifies persons of unsound mind thus: 1, An idiot or fool natural; 2, He who was of good and perfect memory, but by the visitation of God has lost the same; 3, Those who are sometimes of good and perfect memory, and sometimes *non compotes mentis;* and, 4, He who is unsound by his own act, as a drunkard. It frequently occurs that there is partial insanity, or monomania, unsoundness as to one or more persons, or upon one or more subjects, and soundness as to all others. This does not affect the testamentary capacity, in general; only as to the persons or subjects in regard to which the unsoundness exists. Thus, a person may be of sound mind upon all subjects but one;

and a will is good unless it be the result of that particular unsound state of mind. Monomania consists in a mental or moral perversion, or both, in regard to some particular subject or class of subjects; while in regard to others the person seems to have no such morbid affection. The degrees of monomania are very various. In many cases the person is entirely capable of transacting any matters of business out of the range of his peculiar infirmity; and as to those matters out of that range, he may be entirely sound, while as to matters within the range of the infirmity he may be quite unsound.

[1 Red. on Wills, 72, etc., par. 6, etc.]

Whenever it appears that a will is the direct offspring of partial insanity or monomania, it should be regarded as invalid, though the general capacity be unimpeached.

Unsoundness of mind may be the result of disease, drunkenness, or of one of many other causes. In case of drunkenness, there are two conditions, a will made under either of which is invalid, viz: Where the will is made during the period while the person is overcome by the delirium of intoxication, or, where the use of intoxicating drinks has been so extended and so excessive as to permanently disable the mind. But in either case the effect must be to have either temporarily or permanently overcome the judgment and unseated the reason.

A person of sound and disposing mind has a right to make such disposition of his property by will as to him may seem fit. If a person be of sound and disposing mind, it is not for you or me to pronounce against his act. The will should be *his* will, not yours or mine; he is not bound to consult any person as to the propriety of any provision thereof. But he must be in such mental condition *that it be his will*, rather than the ebullition of a disordered intellect.

A person may be said to be of sound and disposing mind who is capable of fairly and rationally considering the character and extent of the property to be disposed of, the persons to whom he is bound by ties of blood, affinity, or friendship, or who have claims upon him, and the persons to

whom, the manner and the proportions in which, he wishes the property to go.

In order to apply these principles to the case in hand, you can ask yourselves such questions as these: Was Mr. James Black at the time of the execution of this alleged will, of sufficiently sound mind that he could fairly and rationally consider the character and extent of his large landed and personal estate? Could he then recollect of what it consisted;—that he owned one tract of land here, another there, and a third beyond; that he had bands of cattle, and money at interest? Could he fairly and rationally consider those bound to him by ties of affinity and of blood, viz, his wife, his daughter, his sisters and his sisters' children? Could he fairly and rationally consider the ties existing between himself and the children of his wife, and between himself and his dependents and friends? Could he fairly and rationally consider and determine for himself, the persons to whom he wished this large estate to go? Could he fairly and rationally consider and determine that he wished to disinherit his daughter and prevent her from having any share in the estate then being disposed of; that he wished the few friends and relatives to have the lands and money named for them respectively, and that he wished all the balance of the estate to go to the persons named as executors in trust for his wife and her children? Could he fairly and rationally consider and determine that he wished the persons named as such to act as executors, they to act without bonds, with power to sell any portion or all of the estate, real and personal; that he wished the title to his estate to go to his executors in trust, they to invest the rents of real estate and the proceeds of personal property, render to Mrs. Black and her children sufficient for their maintenance, and retain the balance and the proceeds of sales of real estate until Mrs. Black's children should respectively attain the age of twenty-five years?

Could he, on the 22d of March, 1866, at the time of executing this paper, fairly and rationally consider and determine all these matters? If yea, then, so far as the subject

now under consideration is concerned, the paper is his will, and should stand; but if nay, it is not his will.

This paper contains a statement that Mr. Black does not make any provision in the will for his daughter, for the reason that she already had a just share of his estate. Had he also sufficient mental capacity to consider and determine for himself whether or not she already had a just share? It is not for you, gentlemen, to determine whether or not she already had a just share; that matter was for him to determine. If he was of sound and disposing mind, you have nothing to do with the propriety or impropriety, the justice or injustice, of any bequest or omission. You may take into consideration the reasonableness or justness of any provision in the will for the purpose of ascertaining the condition of Mr. Black's mind, and for that purpose only. If you find from the facts that Mr. Black does not give his daughter any of his estate, that he gives the bulk of his property to the executors in trust for his wife and her children, or from any other provision in the will, any evidence of unsoundness, then you may take such provisions into account; but not otherwise. You are not here to correct this will and make it conform to your views of right; you are here to determine whether this paper is the result of a rational, sound and disposing mind, or whether it is the outgrowth of a mind diseased, broken, and out of joint.

It would seem to each of you that one of the first objects of his solicitude, if not the first, should be to provide amply in his will for his only child; and it may perhaps seem unkind if not cruel to fail to do so; but if he was of sound and disposing mind, he had a right so to do. Was he under a delusion respecting his daughter—if so, the paper is not his will in that regard. Delusion is the belief of things which do not exist, and which no rational mind would believe to exist, and a will which is the offspring of such delusion is invalid. It is said that he was induced to disinherit his daughter by reason of his dislike of Dr. Burdell. Was there such a dislike? If yea, was there any foundation for it; or, was it a delusion, and did that delusion control him? Delusion is an effect of insanity. Insanity may exist with-

out there being delusion—but delusion never exists unless
the mind be unsound to a greater or less degree.    Delusion,
the having delusive ideas, belief in the existence of things
not existing, which no rational mind would believe, is in-
sanity.

    Gentlemen, take the testimony of all the witnesses —
believe that which impresses you with truth — and decide
these questions — not from fancy or caprice, but from calm,
deliberate judgment.    ·

    3.—Third issue:

    Did the said James Black, at the time of signing the
instrument offered for probate, sign or execute the same
under restraint?

    Restraint is that kind of influence which is exercised by
force, or threats, or coercion, physical or mental, which the
testator is not able to resist, or from fear, by which the
testator is prevented from exercising and expressing his own
judgment and desire.    I find in this case no evidence of any
act of restraint exercised at the time of executing the will.
To avoid a will, it is not necessary that threats, or violence,
should have been practiced or resorted to at the time of
making it, but it is enough, if the will was made after the
threats or violence, under the general controlling and contin-
uing influence of fear or dominion over the testator by the
person who so put him in fear.

    4.—Fourth issue:

    Did the said James Black, at the time of signing the in-
strument offered for probate, sign or execute the same under
undue influence.

    This issue, and the principles governing it, are entirely
different from the principles applying to unsoundness of
mind.    Undue influence is entirely distinct from unsound-
ness.    A man may be of sound and disposing mind, and yet
be the victim of undue influence.    If Mr. Black was of
unsound mind, it is entirely immaterial whether or not any
person exercised undue influence, because unsoundness
would of itself incapacitate him from making a will, influ-

ence or no influence. A man even of sound mind, must be left free to exercise his own judgment and wish in making his will. Not that friends and relatives and legal adviser may not make suggestions and recommendations, but the person must be free to exercise his own wish, notwithstanding such suggestions and recommendations. Undue influence is that kind of influence which prevents the testator from exercising his own judgment, and substitutes, in place thereof, the judgment of another.

[ 1 Jarman on Wills, p. 36.]

The question to determine here is, whether at the time of executing this will, Mr. Black was free to do as he pleased, or whether he was then so far under the influence of any other person that the will is not Mr. Black's will, but is the will of that other person.

You should indulge in no guesses or surmises; but you should be convinced. Of course, persons who intend to control another's actions, especially in regard to making a will, do not proclaim that intent. Very seldom does it occur that a direct act of influence is patent; the existence of the influence must generally be gathered from circumstances — such as, whether he had formerly intended a different disposition of his property; whether he was surrounded by those having an object to accomplish, to the exclusion of others — whether he was of such weak mind as to be subject to influence — whether the paper offered is such a paper as would probably be urged upon him by the persons surrounding him—whether they are benefited thereby to the exclusion of formerly intended beneficiaries.

[ 1 Red. on Wills, p. 514, etc.]

Take all the testimony, and see whether there has been in this case any undue influence—such influence as prevented Mr. Black from expressing in this paper his own wishes, and has caused him to express the wishes of some other.

5.—Fifth issue:

Did the said James Black, at the time of signing the instrument offered for probate, sign or execute the same under fraudulent misrepresentations?

That is, was he induced to execute this will under the representations by any persons that certain things existed which did not in truth exist, which he could not by reasonable inquiry ascertain to be false, and which caused him to make a will different from what he otherwise would have made? Was anything intentionally done by any person to prevent Mr. Black from knowing any of the contents or the effect of any of the contents of this will? Was he intentionally prevented from knowing what disposition he was making of his property?

### 6.—Sixth issue.

Was the said James Black induced to sign or execute the said instrument by means of undue influence on the part of Maria L. Black?

Elsewhere I give you instructions regarding undue influence in general, and in considering this issue you will apply those instructions so far as they relate to acts of Maria L. Black, and make answer as you find the fact to be.

### 7.—Seventh issue:

Was said James Black induced to sign or execute the said instrument, and to disinherit the contestant, by means of fraudulent misrepresentations against the contestant Mary A. Burdell and her husband, or either of them, by said Maria L. Black or any other, and what person or persons?

You will apply what I have already said concerning fraudulent misrepresentation to the facts developed by the evidence, and make such answer as you shall find to be the fact.

### 8.—Eighth issue:

Was the said James Black, at the date of said instrument, and for a long time prior thereto, habitually intemperate?

There is no principle of law especially applicable to this issue—It is purely a question of fact, and you are to answer it from all the testimony in the case.

9.—Ninth issue:

Was the mind of said James Black, at the date of said instrument, so impaired by habitual intemperance that he had not sufficient capacity to make a will?

This issue includes many of the principles suggested in reference to unsoundness of mind. The law books, medical treatises, and our own observation, testify to the fact that the inordinate use of intoxicating liquor does incapacitate men from making wills. We know that it vitiates the blood, produces softening of the brain, disorders the intellect, saps the vital forces, unsettles the healthy action of body and mind, and destroys them both. Yet not in every case of the use of liquors do these results follow. Some men live on, from year to year, drinking largely, attending to their own affairs, and occasionally reach ripe old age. Others break soon. There is no rule by which to determine how much the system of any one man can endure. One man may be sensibly affected by a single debauch, while another may remain sound in mind after many of them. As before remarked, a man temporarily overcome by a single debauch is for the time being of unsound mind and has not testamentary capacity; so, a person to whom intoxication has become such a custom that his intellect is disordered and he has lost the rational control of his mental faculties, is of unsound mind. In response to this issue you are to determine the condition of James Black in this respect. Was his mind vigorous and active, in its normal condition, or was it so enfeebled by his intemperate habits that he could not fairly and rationally consider the character and extent of his property, his relations to others, his ties of blood, affinity and friendship, his duties and responsibilities, the persons to whom and the proportions in which he wished his property to go? As you find the fact to be, so make answer.

10.—Tenth issue:

Did said James Black, at the time of signing said instrument, know or understand the true meaning and construction of said will?

This is rather an uncertain issue.  If he was of sound and disposing mind, free from restraint, undue influence and fraudulent misrepresentation, the law presumes that he knew and understood the true meaning and construction of said will.  If he was not of sound and disposing mind, then, so far as that unsoundness extended, he could not understand the true meaning or construction of the will.  If he was under restraint or undue influence, it is immaterial whether or not he knew or understood it; because, not being able to express his real wishes, his knowledge that he was not expressing his real wishes was not material.  If he was laboring under the effect of fraudulent misrepresentations, he might, so far as those representations are concerned, have known the true meaning and construction of the will, but the instrument would be invalid on account of having been produced falsely.

I can give you no certain guide to aid you in responding to this issue, further than to say, that if your answer to the other issues shall be to the effect of sustaining the will, your answer will be yea, to this issue.   Otherwise, not.